UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Hexamedics, S.A.R.L.,
a French corporation,

Plaintiff,

v.

Guidant Corporation and
Intermedics, Inc.,

Defendants.

Civ. File No. 00-2532 (PAM/JGL)

**MEMORANDUM AND ORDER**

---

This matter is before the Court on Defendants' Motion for Summary Judgment. For the reasons that follow, the Motion is granted in part and denied in part.

**BACKGROUND**

Plaintiff Hexamedics S.A.R.L. ("Hexamedics") is a French company that distributes pacemakers and other cardiac devices in France and French territories. In a sixteen-count Amended Complaint, Hexamedics alleges that Defendants Guidant Corporation ("Guidant") and Intermedics, Inc. ("Intermedics") breached contracts with Hexamedics, committed various torts, and violated French law in Defendants' dealings with Hexamedics. Hexamedics also alleges that Defendants conspired to destroy Hexamedics' business.[1]

[1] On January 14, 2002, the Court granted Hexamedics permission to file an Amended Complaint. Both parties proceed in this Motion under the allegations in the Amended Complaint. However, that Amended Complaint has not yet been filed with the Clerk's Office. The Court will analyze Defendants' Motion as if the Amended Complaint had been filed, and will assume that Hexamedics will act expeditiously to correct this error.

FILED FEB 12 2002
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD
DEPUTY CLERK

Hexamedics distributed Intermedics' products in France, but Hexamedics was not Intermedics' direct distributor. Instead, Intermedics had an exclusive Distributorship Agreement with a company called Kontron Instruments S.A. ("Kontron"). In turn, Kontron had an exclusive agreement with Hexamedics. Kontron was essentially an intermediary between Hexamedics and Intermedics. At Hexamedics behest, Kontron placed orders with Intermedics. Kontron was then obligated to pay Intermedics for the products shipped, with Kontron and Hexamedics splitting the pre-arranged commission. This arrangement was clearly known to and anticipated by Intermedics. Indeed, the Distributorship Agreement between Intermedics and Kontron required Kontron to appoint Hexamedics "as its sole agent for the distribution of [Intermedics'] products in [France]." (Susman Aff. Ex. 2 at ¶ 1.) The Agreement also contained a no-hire clause that prohibited Intermedics from hiring "the employees or agents of the other party unless written consent has been previously granted." (Id. at ¶ 21.) Intermedics and Hexamedics also had separate agreements under which Intermedics would pay Hexamedics bonuses for achieving certain sales targets. These so-called "Volume Bonus Agreements" were memorialized in correspondence between the parties, and provided that, upon payment by Kontron, Intermedics would pay the bonus to Hexamedics directly. (See, e.g., Benoit Aff. Ex. 40 (Dec. 22, 1994, memo from Steve Bowman of Intermedics to Gilles Ascher of Hexamedics).)

The arrangement between Intermedics, Kontron, and Hexamedics began to deteriorate in 1998. Kontron experienced financial difficulties and in the spring of 1998, Intermedics

threatened to terminate the Distributorship Agreement because of Kontron's failure to pay Intermedics. To calm Hexamedics' fears about what would happen if Intermedics terminated Kontron, Intermedics Vice President Steve Bowman wrote to Hexamedics in July 1998. In this letter, Bowman stated that, "[i]n the event Kontron was to become a non-viable business, [Intermedics] would assign the contract for France to Hexamedics." (Susman Aff. Ex. 10 (July 27, 1998, letter from Bowman to Ascher).)

In September 1998, Intermedics' parent company, Sulzer Medica, announced that it was selling Intermedics to Guidant. After this announcement, Guidant entered the discussions over the future of the Distribution Agreement. Richard Van Oostrom, whose position with Guidant is disputed by the parties, wrote to Intermedics that Guidant intended "to continue with the successful Intermedics brand" and "to maintain Intermedics sales and distribution organizations separate from those of Guidant." (Susman Aff. Ex. 15 (Sept. 29, 1998, letter from Van Oostrom to Bowman).) Van Oostrom also emphasized that Guidant would "honor all existing Intermedics contracts." (Id.) Intermedics sent a copy of this letter to its European sales distributors, including Hexamedics.

After the Intermedics sale announcement, Guidant began to negotiate with Hexamedics to buy Hexamedics' business and, over a period of years, turn Hexamedics' sales agents into employees of Guidant. During this time, Kontron's financial situation worsened, and Hexamedics urged Intermedics to terminate Kontron and assign the Distribution Agreement to Hexamedics. Intermedics refused to terminate Kontron.

Intermedics also refused to pay Hexamedics some amounts due under the Volume Bonus Agreement because Intermedics had not received payment from Kontron. (Benoit Aff. Ex. 42 (Oct. 28, 1998, letter from Walter Fritschner of Sulzer Medica to Gilles Ascher).) In January 1999, Kontron declared bankruptcy which, under French law, prohibited Intermedics from terminating the Distribution Agreement. When Intermedics was allowed to terminate the Distribution Agreement in March 1999, it offered to assign that Agreement to Hexamedics with the condition that the Agreement would be limited to products on a July 1996 product list. Hexamedics refused to agree to the condition, and the Distribution Agreement was not assigned.

The sale of Intermedics to Guidant closed on February 1, 1999. Shortly thereafter, Guidant informed Hexamedics that it was no longer interested in a long-term buyout of Hexamedics' business. According to Hexamedics, Guidant simultaneously began to lure Hexamedics' sales agents away from Hexamedics. Several of those agents eventually agreed to work for Guidant France, a subsidiary of Guidant. According to Hexamedics, Guidant's actions, coupled with Intermedics' refusal to assign the Distribution Agreement, virtually destroyed Hexamedics' business.

Hexamedics filed suit in this Court in November 2000. The Amended Complaint raises claims of unfair competition, breach of contract, fraud, tortious interference with contractual relations and with prospective business advantage, and four French law claims,

including abusive termination and mandatory compensation for termination of agency.[2] The Amended Complaint also seeks punitive damages. Defendants have moved for summary judgment on all Counts of the Amended Complaint.

## DISCUSSION

### A. Standard of Review

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. Enter. Bank v. Magna Bank, 92 F.3d 743, 747 (8th Cir. 1996). However, as the United States Supreme Court has stated, "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action." Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Enter. Bank, 92 F.3d at 747. A party opposing a properly supported motion for summary judgment may not rest

[2] The Amended Complaint also contains claims for negligent misrepresentation, breach of fiduciary duty, and breach of contract against Guidant (based on a theory of vicarious liability). (Am. Compl. Counts Five, Seven, and Eight.) Hexamedics is no longer pursuing these claims, however.

upon mere allegations or denials, but must set forth specific facts in the record showing that there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Krenik v. Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

## B. Breach of Contract

Counts Two, Three, and Four of the Amended Complaint claim that Intermedics breached the contract to assign the Distribution Agreement, the contract to pay volume bonuses, and the Distribution Agreement itself. The parties do not dispute that, pursuant to a choice-of-law provision, Texas law applies to claims arising out of the Distribution Agreement. Although the Volume Bonus Agreements do not contain choice-of-law provisions, the parties seem to agree that Texas law applies to those agreements as well. (See Pl.'s Opp'n Mem. at 31-32 (citing Texas caselaw with regard to interpretation of Volume Bonus Agreements).)

### 1. Breach of Agreement to Assign the Distribution Agreement

In his July 27, 1998, letter to Hexamedics, Steve Bowman of Intermedics agreed to assign the Distribution Agreement to Hexamedics if Kontron became "a non-viable business." (Susman Aff. Ex. 10.) Hexamedics contends that Kontron became "non-viable" by October or November 1998, at the latest. Intermedics asserts that the parties intended "non-viable" to mean either Kontron's declaration of bankruptcy or Intermedics' termination of Kontron according to the terms of the Distribution Agreement. Thus, according to

Intermedics, it could not have assigned the Distribution Agreement to Hexamedics at any time before it attempted to do so in March 1999.

Intermedics argues that no consideration supported the July 27, 1998, agreement to assign, and thus that agreement fails as a matter of law. Hexamedics responds that consideration for Intermedics' offer was Hexamedics' continuing to sell Intermedics products without payment, and Hexamedics' refraining from pursuing an alternative distribution arrangement with another manufacturer.[3] Hexamedics has met its burden to show that factual issues exist as to the consideration it provided for the July 27, 1998, letter, and summary judgment is inappropriate on this ground.

Summary judgment is likewise inappropriate on Intermedics' argument that the parties intended "non-viable" to mean only bankruptcy or termination. Intermedics offers no evidence in support of this interpretation of the agreement. Although it is clear that Intermedics could not have assigned the Distribution Agreement to Hexamedics once Kontron formally declared bankruptcy, questions of fact exist as to whether the agreement allowed or mandated that Intermedics assign the Agreement prior to that declaration.

Moreover, questions of fact exist as to whether Intermedics' offer to assign the Distribution Agreement in March 1999 was done in good faith and in accordance with the terms of the agreement. Intermedics claims that the Distribution Agreement itself limited the

[3] Hexamedics' promissory estoppel claim (Am. Compl. Count Sixteen) sets forth these bases as consideration for the agreement to assign the Distribution Agreement.

products available through that Agreement to products on a July 1996 price list. However, the evidence indicates that the performance of the Agreement involved newer products not on the 1996 list. Thus, whether Intermedics' offer constituted an offer to assign within the meaning of the agreement to assign is a question of fact for the jury to resolve.

2. Breach of Volume Bonus Agreement

Hexamedics cannot, however, show that questions of fact exist as to the alleged breach of the Volume Bonus Agreements. As evidenced by correspondence between the parties going back to 1994, it is clear that Intermedics would pay Hexamedics only if Kontron paid Intermedics. Hexamedics claims that Intermedics breached this Agreement by failing to make payments in 1999 and 2000, but has offered no evidence that Hexamedics sold Intermedics' products during that period, or that Hexamedics attained the sales goals necessary to earn the volume bonuses during that period. Count Three of the Amended Complaint fails as a matter of law.

3. Breach of Distribution Agreement

Hexamedics was undisputedly not a party to the Distribution Agreement, and therefore its claims for breach of that Agreement depend on its alleged status as a third-party beneficiary of the Agreement. Defendants assume for the purposes of their Motion that Hexamedics was a third-party beneficiary, and the Court will make the same assumption. However, as Defendants note, Hexamedics' status as a third-party beneficiary does not give Hexamedics greater rights than those provided in the Distribution Agreement. Stonewall Ins.

Co. v. Modern Exploration, Inc., 757 S.W.2d 432, 434-35 (Tex. App. - Dallas 1988, no writ) ("The beneficiary for whose advantage a contract is made cannot acquire a better standing to enforce the contract than that occupied by the contracting party itself.").

Hexamedics claims that Intermedics breached the Distribution Agreement in several ways: (1) by failing to pay commissions to Hexamedics; (2) by failing to honor the no-hire clause; and (3) by breaching the implied covenant of good faith and fair dealing.[4] (Am. Compl. ¶ 77.) The Court has previously determined that Hexamedics has failed to show that Intermedics was bound to pay commissions under the Volume Bonus Agreement, and it is not disputed that the Distribution Agreement does not provide an independent basis for Hexamedics' claim for commissions. Thus, this first claim fails as a matter of law.

Hexamedics contends that Intermedics breached the Distribution Agreement by hiring Hexamedics' agents in violation of the no-hire clause. Defendants respond that Hexamedics' agents were hired by non-party Guidant France, and that neither Guidant nor Intermedics can be legally responsible for the acts of Guidant France. However, Hexamedics has come forward with evidence that the decision to hire Hexamedics' agents was made by both Guidant and Intermedics, that both Guidant and Intermedics were involved in soliciting the agents, and that, once hired, these agents sold Intermedics' products in France. There is a question of fact as to whether Guidant and Intermedics breached the no-hire clause, and

[4] Hexamedics also claimed that Intermedics breached the Distribution Agreement by failing to supply products to Hexamedics. After the hearing on Defendants' Motion, however, Hexamedics dropped this claim. (Feb. 1, 2002, letter from Stephen D. Susman to Court.)

summary judgment should be denied on this claim.

Hexamedics does not clearly articulate the basis for its claim for breach of the covenant of good faith and fair dealing. Hexamedics attempts to characterize all of the alleged breaches of contract discussed above as breaches of the covenant of good faith and fair dealing. However, the covenant cannot impose obligations different from those imposed by the contract, and thus, to the extent that Hexamedics' good-faith covenant claim depends on Intermedics' failure to supply products or pay commissions, that claim fails.

However, Hexamedics good-faith covenant claim appears to encompass more than the alleged breaches catalogued above. Throughout its Amended Complaint and its papers, Hexamedics criticizes Guidant's decision not to "dual-brand" in France. In other words, Hexamedics believes that Guidant should have continued to offer for sale in France Intermedics' products that were essentially identical to Guidant's products. Indeed, Hexamedics appears to believe that Guidant was somehow bound to do so by the covenant of good faith and fair dealing.

Aside from the deference due Guidant's business judgment and the fact that Guidant was not a party to the Distribution Agreement, it is difficult to understand how Guidant's decision not to dual-brand, even preceded by Guidant's assurances that it would dual-brand, amounts to a breach by Intermedics of the covenant of good faith and fair dealing in the Distribution Agreement. The failure to dual-brand, and Hexamedics' alleged reliance on statements that Guidant would pursue a dual-brand strategy, is more akin to an allegation of

fraudulent misrepresentation or perhaps unfair competition. Hexamedics may not recover under the good-faith covenant theory for these alleged misrepresentations.

## C. Tort Claims

The parties agree that Texas law applies to Hexamedics' claims for fraud, unfair competition, and tortious interference against Intermedics. Guidant contends that French law applies to the tort claims against it. However, Guidant also contends that the only conflict between French law and Texas law with respect to the tort claims is that French law does not allow for the imposition of punitive damages. The Court is not persuaded that French tort law should apply to the tort claims against Guidant, and therefore will apply Texas law to all of Hexamedics' tort claims.

### 1. <u>Fraud</u>

Hexamedics claims that Defendants committed fraud by making false representations or material omissions and by entering into agreements with Hexamedics never intending to perform those agreements. According to Hexamedics, Guidant committed fraud by assuring Hexamedics that it would dual-brand when it had no intent to do so and by stating that Guidant would honor Intermedics' contracts, including no-hire clauses, when it did not intend to do so. Hexamedics also alleges that Intermedics committed fraud by entering into the July 27, 1998, agreement with no intent to assign the Distribution Agreement to Hexamedics.

The parties quibble over the meaning of various phrases in the allegedly fraudulent representations. However, when evaluating an alleged misrepresentation, it is important to examine the entire statement, the context in which that statement was made, and the effect the statement was likely to have in that context. See, e.g., Ernst & Young v. Pac. Mut. Life Ins. Co., 51 S.W.3d 573, 575 (Tex. 2001) (reviewing context of allegedly fraudulent statements). For example, Defendants allege that Mr. Van Oostrom's[5] use of the word "separate" to describe Guidant and Intermedics in his September 29, 1998, letter should have communicated to Hexamedics that Guidant did not consider itself bound by the no-hire clause in the Distribution Agreement. Whether Hexamedics could reasonably understand Van Oostrom's statement in this manner depends on the context of that statement. It is clear that the letter containing the "separate" statement was intended to reassure Hexamedics of its importance to Intermedics' business. Indeed, the letter states that Guidant intends to "continue with the successful Intermedics' brand." (Benoit Aff. Ex. 51 (September 29, 1998, letter from Van Oostrom to Bowman).) Moreover, the letter "emphasize[s]" that Guidant would "of course, honor all existing Intermedics contracts." (Id.) Mr. Van Oostrom's use of the word "separate" to describe Guidant and Intermedics cannot be read to nullify the other

---

[5] Guidant claims that Mr. Van Oostrom was merely a president of a division of Guidant, and could not bind or speak for Guidant. However, Hexamedics has come forward with evidence that Mr. Van Oostrom was in fact President of Guidant Europe, Africa, and Middle East, was one of the highest-paid executives in Guidant, and was on Guidant's management team. A reasonable jury could conclude from this evidence that Mr. Van Oostrom's statements were statements of Guidant on which others could rely.

statements in the letter, namely that Guidant intended to dual-brand and that Guidant considered itself bound by Intermedics' contracts. Hexamedics could reasonably have relied on these statements, and at least for the purposes of this Motion, appears to have done so.

Moreover, Guidant's reversal of course as to the dual-brand strategy and the no-hire clause, coupled with Guidant's surreptitious attempts to hire away Hexamedics' sales representatives, raise a fact issue as to whether at the time Guidant made these statements, Guidant intended to do what it promised. Hexamedics is entitled to proceed to a jury on its fraud claims against Guidant.

Hexamedics does not have similarly damning evidence with respect to Intermedics' intent to perform the July 27, 1998, agreement to assign the Distribution Agreement. Steve Bowman, who wrote the July 27, 1998, letter, testified that Intermedics did intend to assign the Distribution Agreement to Hexamedics. (Benoit Aff. Ex. 34 at 296 (Bowman Dep.).) The evidence indicates that, if Intermedics at some point decided to breach the agreement to assign, that decision was made long after July 27, 1998. Hexamedics' fraud claim against Intermedics fails.

2. Tortious Interference

Hexamedics alleges that Guidant and Intermedics tortiously interfered with the contracts between Hexamedics and its sales agents by, among other things, attempting to hire those agents and failing to implement a dual-brand strategy in France. Hexamedics also alleges that Guidant interfered with Intermedics' contracts with Hexamedics. Finally,

Hexamedics contends that Defendants tortiously interfered with Hexamedics' relationships with its actual and prospective customers.

As an initial matter, it is clear that Guidant could not interfere with Intermedics' contract with Hexamedics. The Texas Supreme Court has held that a party cannot interfere with its own contracts, and that an agent of a party cannot, if acting in the party's interest, interfere with the party's contracts. Holloway v. Skinner, 898 S.W.2d 793, 795 (Tex. 1995). By advancing an interference claim against Guidant for interference in the contracts between Intermedics and Hexamedics, Hexamedics is attempting to have its cake and eat it, too. For the purposes of its other claims, Hexamedics argues that Guidant and Intermedics were acting in concert and were, in essence, the same entity. For the tortious interference claim to succeed against Guidant, however, Hexamedics must contend that Guidant and Intermedics were not acting in the same interest and were not essentially one entity. This Hexamedics cannot do, at the peril of losing many of its other claims.

However, either Guidant or Intermedics (or both) could have interfered with Hexamedics' contracts with its sales agents. As noted above, Hexamedics has raised genuine questions of fact as to whether Guidant and Intermedics participated in persuading Hexamedics' sales agents to become employees of Guidant. If Guidant and Intermedics did participate, then each could be said to have tortiously interfered with the contracts between Hexamedics and these agents. Hexamedics' other allegation in this regard is less compelling, although it survives summary judgment. If Hexamedics can prove that Guidant's decision

to forego the dual-brand strategy was made specifically to encourage Hexamedics' agents to leave Hexamedics, then this conduct could constitute interference. The question of intent is central to the tortious interference issue and is a question of fact that is not amenable to resolution on a motion for summary judgment.

Defendants' only argument with regard to Hexamedics' allegation that Defendants tortiously interfered with Hexamedics' prospective business advantage is that conduct that is not independently tortious cannot constitute tortious interference. (Defs.' Supp. Mem. at 38.) However, as noted above, some of the conduct of which Hexamedics complains, such as Guidant's alleged misrepresentations with respect to dual-branding, may be independently tortious, and may constitute tortious interference with Hexamedics' relationships with those customers. Defendants are not entitled to summary judgment on this claim.

3. Unfair Competition

Under Texas law, unfair competition requires proof of an underlying tort that interferes with a plaintiff's business. Continental Airlines, Inc. v. Am. Airlines, Inc., 824 F. Supp. 689, 694 n.6 (S.D. Tex. 1993). As discussed at length above, Hexamedics has established that material questions exist as to some of its fraud and tortious interference claims. Hexamedics has also established that, if proven, these torts adversely effected Hexamedics' business. Hexamedics' unfair competition claim based on those fraud and tortious interference claims thus also survives summary judgment.

### D. French Claims

Hexamedics raises four claims under French law: (1) mandatory compensation for termination of agency; (2) abusive termination; (3) termination without sufficient notice; and (4) abusive termination of commercial relations. Defendants assert that these claims fail because Texas law, not French law, applies, and because under French law, Hexamedics is not an agent and has not complied with the prerequisites of the agency statute.

Hexamedics responds to Defendants' assertions with the affidavit of Gene Dye, who professes to be an expert in French law. Defendants have moved to strike this affidavit as untimely under the Rule 16 Scheduling Order. As Defendants point out, under that Scheduling Order Hexamedics was required to identify its expert witnesses by October 25, 2001. Mr. Dye was not identified until December, and even then Hexamedics did not specifically inform Defendants that it was identifying a new expert witness. Rather, Hexamedics placed Mr. Dye's affidavit at the bottom of the enormous stack of evidentiary materials it submitted in opposition to Defendants' Motion. In his affidavit, Mr. Dye purports to examine Hexamedics' claims under French law and, unsurprisingly, concludes that Hexamedics is entitled to proceed to a jury on those claims.

Hexamedics opposes Defendants' Motion to Strike, noting that Mr. Dye is not an expert who will testify at trial, and thus is not subject to the Scheduling Order. Hexamedics claims that, under Rule 44.1, the Court can properly rely on expert testimony such as that offered by Mr. Dye. Defendants' Motion to Strike will be denied, but the Court will not give

more than passing consideration to the "opinions" offered by Mr. Dye. Many of these opinions are not the proper subject of expert testimony. The Court must determine what the law is. Rule 44.1 does contemplate using testimony to decipher foreign law, but testimony of the sort Mr. Dye offers, namely testimony as to the ultimate issue, usurps the province of the Court. The Court will not rely on Mr. Dye's conclusions.

In arguing that Defendants are entitled to summary judgment on Hexamedics' French claims, Defendants contend that Hexamedics does not fit within the French statute's definition of agency and that, even if Hexamedics was Intermedics' agent, Hexamedics failed to apply to Intermedics for indemnity within one year, and thus Hexamedics' claim for mandatory compensation fails. Aside from Mr. Dye's affidavit, the record consists solely of a certified translation of the French statute. (Benoit Aff. Ex. 47.)

The French statute strictly limits agents to entities or people who are authorized to act in the name of the principal. (See id. at Article L.134-1.) There is no evidence that Hexamedics was ever authorized to act in the name of Intermedics. Indeed, the Distribution Agreement that defines the relationships between Kontron, Intermedics, and Hexamedics explicitly states that "[n]othing contained in this Agreement will constitute or create a relationship of . . . principal-agent . . . between [Intermedics] and [Kontron]," and further provides that "[Kontron] will have neither authority nor power to bind or to contract in the name of [Intermedics] . . . ." (Susman Aff. Ex. 2 at ¶ 19.) If Kontron was not Intermedics' agent, then Kontron's agent, Hexamedics, could not have been intended to be Intermedics'

agent. Thus, Hexamedics was not Intermedics' agent within the meaning of French law. All of Hexamedics' French claims appear to depend on the existence of an agency relationship. Because no such relationship existed, the French-law claims must be dismissed.

## CONCLUSION

Accordingly, for the foregoing reasons, and upon all of the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendants' Motion for Summary Judgment (Clerk Doc. No. 101) is **GRANTED in part** and **DENIED in part**;

2. Counts Three, Five, Seven, Eight, Eleven, Twelve, Thirteen, and Fourteen of the Amended Complaint are **DISMISSED**; and

2. Defendants' Motion to Strike (Clerk Doc. No. 113) is **DENIED**.

Dated: February 8, 2002

Paul A. Magnuson
United States District Court Judge