UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Hexamedics, S.A.R.L.,

Plaintiff,

v.

Guidant Corporation and Intermedics, Inc.,

Defendants.

Civ. No. 00-2532 (JNE/JGL)
ORDER

---

Stephen D. Susman, Esq., Geoffrey L. Harrison, Esq., and Harry P. Susman, Esq., Susman Godfrey L.L.P., appeared for Plaintiff Hexamedics, S.A.R.L.

Robert L. Schnell, Jr., Esq., Faegre & Benson LLP, Edward L. Friedman, Esq., Craig L. Weinstock, Esq., and Brent A. Benoit, Esq., Locke Liddell & Sapp LLP, appeared for Defendants Guidant Corporation and Intermedics, Inc.

---

This is an action by a corporation that distributed and sold products in France and French territories, Hexamedics, S.A.R.L., against the manufacturer of the products, Intermedics, Inc., and the manufacturer's owner, Guidant Corporation. Hexamedics asserts claims under Texas law for unfair competition, breach of contract, fraud, tortious interference with contractual and prospective business relationships, and promissory estoppel. The matter comes before the Court on a motion by Guidant Corporation and Intermedics (collectively, Defendants) to exclude the expert testimony of Hexamedics' damages expert, and a motion by Guidant Corporation to exclude evidence of conduct and statements of two of its subsidiaries, Guidant Europe and

FILED APR 30 2003
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTERED
DEPUTY CLERK'S INITIALS

Guidant France.[1] For the reasons given below, the Court grants the motions in part and denies them in part.

## I. DEFENDANTS' MOTION TO EXCLUDE THE EXPERT TESTIMONY OF HEXAMEDICS' DAMAGES EXPERT

Hexamedics' damages expert is Timothy Nantell, a finance professor at the University of Minnesota Carlson School of Management. (Schnell Aff. Ex. 2.) Nantell calculated Hexamedics' damages using a lost-profits model, which generated damages of $20,262,159, and a lost-value model, which generated damages of $12,260,947. (*Id.*) Defendants argue that Nantell's expert testimony as to both models is inadmissible under Fed. R. Evid. 702, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

When evaluating the admissibility of expert testimony under Rule 702, a district court must determine whether the testimony is reliable and relevant. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147, 149 (1999); *see Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589, 597 (1993). The proponent of the expert testimony bears the burden of proving its admissibility by a preponderance of the evidence. *Daubert*, 509 U.S. at 592 n.10; *Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001).

---

[1] At the hearing on the motions, the Court gave Guidant Corporation permission to file a 12-page supplemental memorandum regarding its motion to exclude evidence of conduct and statements of Guidant Europe and Guidant France. Guidant Corporation filed a 15-page memorandum, accompanied by a motion for leave to file the three extra pages. The Court grants this motion.

### A. Lost-Profits Model

The lost-profits model calculates the difference of the sum of Hexamedics' profits in 1999, 2000, and 2001, and the sum of what Hexamedics' profits in 1999 and 2000 would have been if Defendants had assigned a Distribution Agreement to Hexamedics. (Schnell Aff. Ex. 2; Nantell Dep. at 84, 86-87.) Under the Distribution Agreement, Hexamedics would have been the exclusive distributor of Intermedics products in France and French territories through December 31, 2000. (Susman Aff. Ex. 5.)

Defendants challenge the lost-profits model on several grounds. First, they argue that the model is inadmissible because it includes damages based on Hexamedics' French-law claims, which are no longer part of this case. *See Children's Broad. Corp. v. Walt Disney Co.*, 245 F.3d 1008, 1018 (8th Cir. 2001) (holding district court's conclusion that it should have excluded testimony of damages expert was not an abuse of discretion, in part because expert's opinion was based on claims that did not survive summary judgment). Nantell's calculation of Hexamedics' profits under the Distribution Agreement assumes that Intermedics would have "bought out" Hexamedics for approximately $15 million upon the expiration of the Distribution Agreement. According to Defendants, this assumption is based on a French statute that requires principals to indemnify their commercial agents upon termination of the agency relationship. In its First Amended Complaint, Hexamedics asserted several claims under the French statute. The Court granted Defendants' motion for summary judgment on those claims, reasoning that the French statute did not apply because, under the Distribution Agreement, Hexamedics would not have been Intermedics' agent. *Hexamedics, S.A.R.L. v. Guidant Corp.*, Civ. No. 00-2532, 2002 WL 246678, at *7-8 (D. Minn. Feb. 8, 2002) (Magnuson, J.).

Defendants took Nantell's deposition in December 2001, approximately two months *before* the Court concluded that the French statute did not apply. At his deposition, Nantell explained that he arrived at the buyout price of $15 million by doubling the commissions Hexamedics would have earned under the Distribution Agreement in 2000. (Nantell Dep. at 45-46.) Nantell testified that the buyout was linked to statutory protection for commercial agents in France. (*Id.* at 281.) He testified further that the French statute applied in this case because Hexamedics would have performed the functions of an agent under the Distribution Agreement. (*See id.* at 279, 281-83.) Nantell testified that, if the French statute did not apply to Hexamedics, then the buyout would have to be removed from his calculation of Hexamedics' damages:

> Q: You're assuming that there is some statutory protection that would still apply to a distributor . . . is that right?
>
> A: It's my understanding that it [the statutory protection] applies to Hexamedics in this case because of the relationships that they have with Guidant and with Intermedics.
>
> Q: Okay. And that's an assumption you make?
>
> A: That's part of the analysis, and if that's wrong, then the two x [buyout] is—the Court will decide that there shouldn't be a two x [buyout].

(*Id.* at 283.) Similarly:

> Q: Assume for the sake of discussion that there is no legal obligation by Intermedics to buy out Hexamedics at the end of the assignment scenario. In that case, you have to make adjustments to [the lost-profits model] which assumes a buyout, right?
>
> A: Yes. And just to be careful, I think you've asked me that question before, and what I said [was] if there is no two x [buyout], if the Court says there is no two x [buyout], then there should be no two x [buyout] in those tables.

(*Id.* at 295.) This deposition testimony provides powerful support for Defendants' position that the buyout was based on the French statute.

Hexamedics disagrees, arguing that Nantell's deposition testimony shows that the buyout was based on a number of sources. Hexamedics relies on the following testimony:

> Q: Where does two times [the commissions] come from?
>
> A: Well, it comes from a number of places. One is that it's the arrangement that was negotiated between Guidant/Intermedics and Hexamedics as to the buyout, the so called buyout price that would be paid by them to buy out Hexamedics, and so it presents itself as an option when you have willing and informed buyers and sellers coming to that point. You say, well; where does that come from.
>
> And then as I started asking that question and reading the record, it seemed to me that the two times was pretty standard and understood by a number of people as kind of a standard buyout arrangement. So that's where it comes from. And then apparently, there is some French law to that effect or at least some French legal opinion to that effect.

(*Id.* at 46.)

Nantell's statement about "some French law" or "some French legal opinion" supports the conclusion that the buyout was based on the French statute. As for Nantell's references to the negotiations between Defendants and Hexamedics regarding a buyout price and his opinion that "two times" is a standard way to arrive at a buyout price, both relate to Nantell's opinion that the proper way to calculate the buyout price was to double Hexamedics' commissions. Defendants' attack on the lost-profits model is not directed at Nantell's calculation of the buyout price. Rather, they challenge the basis for Nantell's assumption that Defendants would have had to buy out Hexamedics at the end of 2000, regardless of the particular buyout price. Moreover, to the extent that one could infer from Nantell's testimony that Defendants and Hexamedics agreed that Intermedics would buyout Hexamedics when the Distribution Agreement expired, such an inference finds no support in the record. Defendants and Hexamedics did engage in negotiations in late 1998 and early 1999, but those negotiations did not contemplate an assignment of the Distribution Agreement to Hexamedics. Instead, under the arrangement

discussed by the parties, Hexamedics would have served as the exclusive agent of either Intermedics or another distributor through December 2001. (*See* Susman Aff. Ex. 7.) For these reasons, the Court concludes that the deposition testimony cited by Hexamedics fails to establish that the buyout is not linked to the French statute.

Hexamedics also relies on a declaration by Nantell dated November 2002, approximately nine months *after* the Court concluded that the French statute did not apply to Hexamedics. In the declaration, Nantell flatly contradicts his earlier deposition testimony by stating that the buyout has nothing to do with the French statute. (*See* Nantell Dec. ¶¶ 7, 9-11.) Nantell now claims that the buyout "reflects the fact that at the end of the term of the Distribution Agreement, Intermedics would have to make a payment to Hexamedics to buyout the prohibition on hiring Hexamedics' sales force." (*Id.* ¶ 7.) This statement refers to the Distribution Agreement's no-hire clause, which provides: "After expiration or termination of this Agreement, the parties agree, for a period of one year, not to hire the employees or agents of the other unless written consent has been previously granted." (Susman Aff. Ex. 5 ¶ 20.) The Distribution Agreement does not contemplate a "buyout" of the no-hire clause by Intermedics. Moreover, Nantell never mentioned the no-hire clause in his deposition testimony when he explained the basis for including the buyout.

Nantell's declaration also reiterates that "2x [meaning two times annual commissions] was a common buyout amount in the French marketplace and a buyout amount negotiated between the parties to this case." (Nantell Dec. ¶ 11.) Again, Defendants challenge the basis for Nantell's assumption that Intermedics would have to buy out Hexamedics at the end of 2000, not the $15-million price calculated by Nantell. Moreover, as already stated, any discussion of a

buyout that occurred during the negotiations between Defendants and Hexamedics was not related to the Distribution Agreement.

In his declaration, Nantell makes no effort to explain away his deposition testimony that he understood that the buyout was linked to the French statute, or that the French statute applied to Hexamedics because it would have performed the functions of an agent under the Distribution Agreement. He does, however, set forth four reasons that purportedly demonstrate that he never conceded that the buyout would have to be removed if the French statute did not apply. First, Nantell notes that the word "indemnity" was never uttered during the deposition. (*Id.* ¶ 9.) Apparently, the suggestion is that because the French statute contains the word "indemnity," Nantell's failure to use the word shows that he did not have the French statute in mind. If this were true, it would follow that Nantell must have had some other French statute in mind; specifically, one that does not include the magic word "indemnity." Nantell has failed to identify any such statute.

Second, Nantell points to the deposition testimony cited by Hexamedics. (*Id.*) As discussed above, that testimony does not support the proposition that the buyout was not linked to the French statute.

Third, Nantell states that it was Defendants' counsel, rather than Nantell, who focused on the link between the buyout and the French statute. (*Id.*) The fact that Defendants' counsel focused on the French statute and asked Nantell questions regarding the French statute does not alter the meaning of Nantell's answers to those questions. For example, Defendants' counsel asked Nantell whether it was his understanding that the "buyout was linked to statutory protection for commercial agents in France." (Nantell Dep. at 281.) If, as Nantell now claims, the buyout was *not* linked to the French statute, he would have cleared up counsel's

misunderstanding, or, at the very least, answered the question in the negative. Instead, Nantell answered, "That's my understanding." (*Id.*) Similarly, if the buyout was *not* linked to the French statute, Nantell would have explained that his inclusion of the buyout did not depend on whether the French statute applied. Instead, Nantell testified that if his view that the French statute applied to Hexamedics proved incorrect, "then the two x [buyout] is—the Court will decide that there shouldn't be a two x [buyout]." (*Id.* at 283.)

Finally, Nantell claims that Defendants' counsel merely asked him if his analysis would change "if there was no 2x buyout," and that he merely "pointed out the tautological nature of the question by answering that if the court decided there was no 2x buyout, then there was no 2x buyout." (Nantell Dec. ¶ 9; *see id.* ¶ 11.) The deposition transcript does not support Nantell's characterization of counsel's questions or his answers. When counsel asked Nantell if he assumed that "there is some statutory protection" that applies to distributors, Nantell responded that it was his understanding that the statutory protection applied to Hexamedics. (Nantell Dep. at 283.) Counsel followed up, saying: "Okay. And that's an assumption you make?" (*Id.*) Nantell then *volunteered his view* that "That's part of the analysis, and if that's wrong, then . . . the Court will decide that there shouldn't be a two X." (*Id.*)

In sum, Nantell's attempts to establish that the buyout was based on the Distribution Agreement's no-hire clause and to reconcile his current position with his earlier deposition testimony that the buyout was linked to the French statute are not convincing. It appears to the Court that Nantell's current position is motivated by a desire to avoid the consequences of the Court's ruling that the French statute does not apply to Hexamedics. Because the lost-profits model's assumption that Intermedics would buy out Hexamedics at the end of 2000 is based on French law claims that did not survive summary judgment, the model does not fit the facts of

this case. Accordingly, the Court concludes that Nantell's testimony as to the lost-profits model is inadmissible under Rule 702. *See Children's Broad. Corp.*, 245 F.3d at 1018. In light of this conclusion, the Court need not consider Defendants' other challenges to the lost-profits model.

**B. Lost-Value Model**

The lost-value model calculates the difference of Hexamedics' "unimpaired value"—that is, its value but for Defendants' alleged misconduct—and Hexamedics' "impaired value"—that is, its actual value. (Schnell Aff. Ex. 2.) To determine Hexamedics' unimpaired value, Nantell looked to a December 15, 1998, letter of intent prepared by Guidant Corporation that set forth the terms of a proposed purchase of Hexamedics by Guidant Corporation. (*See id.* ¶ 17; Nantell Dep. at 95-96.)

Defendants present two main arguments in support of their position that Nantell's testimony related to the lost-value model is inadmissible.[2] Their first argument is that Nantell's calculation of Hexamedics' unimpaired value improperly ignores the subsequent course of negotiations between Guidant Corporation and Hexamedics, during which Guidant Corporation's estimation of Hexamedics' value decreased considerably. The Court does not find this argument persuasive. According to Hexamedics, any decrease in value that occurred after December 15, 1998, was caused by Defendants' wrongful conduct. Thus, it was appropriate for Nantell to

[2] Defendants make a third argument that does not merit extended discussion. At a pretrial conference, Hexamedics represented that it would abandon the lost-profits model if Defendants agreed to drop its challenge to the lost-value model. (Schnell Aff. Ex. 1 at 8.) According to Defendants, this offer demonstrates that Hexamedics "know[s]" that the lost-value model is inadmissible. Hexamedics' motive for making the offer of compromise has no bearing on the legal question of whether the lost-value model is admissible under Rule 702.

focus on the terms of the December 15, 1998, letter of intent in calculating Hexamedics' unimpaired value.[3]

Defendants' second argument is that, in calculating Hexamedics' unimpaired value, Nantell improperly ignored data regarding bids by other competitors. Specifically, Defendants contend that Nantell should have considered a "confirmed rumor" that Medtronic allotted $12 million for the purpose of hiring Hexamedics' sales force in October 1998. (Ascher Dep. at 237, 257-58.) The Court disagrees with Defendants on this point, as well. Nantell's decision to base his valuation on the concrete terms of Guidant Corporation's December 15, 1998, letter of intent, rather than the "confirmed rumor" that Medtronic was willing to spend up to $12 million to hire all or some of Hexamedics' sales force in October 1998, does not render his testimony unreliable or irrelevant. Based on these considerations, the Court denies Defendants' motion to exclude Nantell's expert testimony as it relates to the lost-value model.

## II. GUIDANT CORPORATION'S MOTION TO EXCLUDE EVIDENCE OF CONDUCT AND STATEMENTS OF GUIDANT EUROPE AND GUIDANT FRANCE

"It is a general principle of corporate law deeply 'ingrained in our economic and legal systems' that a parent corporation (so-called because of control through ownership of another corporation's stock) is not liable for the acts of its subsidiaries." *United States v. Bestfoods*, 524 U.S. 51, 61 (1998) (citations omitted). Relying on this general principle, Guidant Corporation argues that evidence of conduct and statements of its subsidiaries, Guidant Europe and Guidant France, cannot be admitted for the purpose of establishing the liability of Guidant Corporation itself.

---

[3] Of course, to recover the full amount of damages generated by the lost-value model, Hexamedics will have to convince the jury that there is a causal link between Defendants' alleged misconduct and Hexamedics' decreased value.

Hexamedics acknowledges that a parent generally cannot be held liable for the acts of its subsidiaries. It argues, however, that this principle does not apply here because the question before the Court is not whether Guidant Corporation can be held liable for the acts of Guidant Europe and Guidant France, but whether evidence of conduct and statements of Guidant Europe and Guidant France can be admitted against Guidant Corporation. According to Hexamedics, to determine whether such evidence is admissible, the Court must apply Fed. R. Evid. 801(d)(2)(D), which provides that a statement offered against a party is "not hearsay" if made "by the party's agent or servant concerning a matter within the scope of agency or employment, made during the existence of the relationship." All of the evidence at issue in this case is admissible against Guidant Corporation pursuant to Rule 801(d)(2)(D), the argument continues, because Guidant Europe and Guidant France acted as the agents of Guidant Corporation.

The Court is not persuaded that there is a meaningful distinction between the question whether Guidant Corporation can be held liable for the acts of its subsidiaries and the question whether evidence of conduct and statements of the subsidiaries can be admitted for the purpose of establishing the liability of Guidant Corporation. Without a theory of liability that would allow a jury to find Guidant Corporation liable for the acts of the subsidiaries, evidence of conduct and statements of the subsidiaries is irrelevant. Hexamedics has not explicitly articulated such a theory. Hexamedics' reliance on Rule 801(d)(2)(D) implies that it will try to prove that Guidant Europe and Guidant France were Guidant Corporation's agents, and that Guidant Corporation is liable as a principal for the acts of its agents. A parent corporation can be held vicariously liable for the acts of a subsidiary corporation if an agency relationship exists between the parent and the subsidiary. *See* Restatement (Second) of Agency § 14M (1958) (discussing agency relationship between parent and subsidiary).

Guidant Corporation argues that Hexamedics should not be permitted to present an agency argument to the jury because, prior to its response to the instant motion, Hexamedics had never asserted that Guidant Corporation is liable for the acts of its subsidiaries under an agency theory. Hexamedics argues that it has pleaded an agency theory, citing in support of its position several paragraphs of a document that Hexamedics claims is its "First Amended Complaint." (Docket No. 168 at 2-3.)

Hexamedics commenced this action in November 2000. Hexamedics' original Complaint names only two defendants: Guidant Corporation and Intermedics. (Docket No. 1 ¶¶ 2-3.) The Complaint does not mention Guidant Europe or Guidant France, does not allege that Guidant Corporation's subsidiaries acted as agents of Guidant Corporation, and does not otherwise allege that Guidant Corporation is liable for the acts of its subsidiaries. (*See id.*)

During the discovery process, Guidant Corporation informed Hexamedics that many of the acts alleged in the Complaint were performed by its subsidiaries, rather than Guidant Corporation itself. (*See* Docket No. 86 at 1-6.) On November 13, 2001, Hexamedics moved for leave to amend the Complaint. (Docket No. 85.) In the proposed amended complaint, Hexamedics added Guidant Europe, Guidant France, and another of Guidant Corporation's subsidiaries as defendants. (Docket No. 87 Ex. A. ¶¶ 4-6.) The proposed amended complaint alleges that Guidant Corporation is liable for the acts of its subsidiaries, that Guidant Corporation and the named subsidiaries "operated at all times as a single entity in disregard for corporate formalities," that Guidant Corporation "exercised complete domination and control over" the named subsidiaries, and that "the corporate veil between Guidant Corporation and [the named subsidiaries] should be pierced." (*Id.* ¶¶ 61-63.)

For reasons that are not disclosed in the record, Hexamedics withdrew its motion for leave to amend the Complaint on November 27, 2001. (Docket No. 95.) As a result, the proposed amended complaint—the document that Hexamedics claims is its "First Amended Complaint"—*was never filed.* It is possible that Hexamedics' made a mistake when it represented to the Court that the withdrawn document was actually the "First Amended Complaint." Another explanation is that Hexamedics made a conscious decision to attempt to mislead the Court. Whatever the explanation for Hexamedics' misrepresentation, the important point for purposes of the instant motion is that Hexamedics cannot rely on the provisions of a document that was never filed to demonstrate that Guidant Corporation had notice that Hexamedics would seek to hold Guidant Corporation liable for the acts of its subsidiaries under an agency theory.

In December 2001, Hexamedics, Guidant Corporation, and Intermedics filed a joint motion for leave to amend the pleadings. (Docket No. 116.) The Court granted the motion in January 2002, (Docket No. 119), and Hexamedics filed its First Amended Complaint the following month, (Docket No. 124). The First Amended Complaint does not contain any of the allegations related to Guidant Europe and Guidant France that were present in the proposed amended complaint. (*See id.*) Instead, like the original Complaint, the First Amended Complaint names only Guidant Corporation and Intermedics as defendants, does not allege that Guidant Europe or Guidant France acted as Guidant Corporation's agents, does not otherwise allege that Guidant Corporation is liable for the acts of Guidant Europe or Guidant France, and does not even mention Guidant Europe or Guidant France. (*See id.*)

When Guidant Corporation moved for summary judgment, it noted that "Guidant Corporation is not the same entity as Guidant Europe or Guidant France," and that

"[Hexamedics] fails to allege any theory under which it could hold Guidant [Corporation] liable as a matter of law for the actions of Guidant Europe or Guidant France." (Docket No. 102 at 24.) In responding to Guidant Corporation's motion, Hexamedics did not assert that Guidant Europe and Guidant France were agents of Guidant Corporation, and did not assert that Guidant Corporation was liable for the acts of Guidant Europe and Guidant France. Rather, Hexamedics position was that many of the acts identified by Guidant Corporation as acts of Guidant Europe or Guidant France were acts of Guidant Corporation itself. (*See* Docket No. 104 at 33, 43; Docket No. 111 at 1-2.)

As this history of the litigation demonstrates, from the time Hexamedics commenced the action in November 2000, until it filed its response to Guidant Corporation's motion in limine in November 2002, Hexamedics' theory of the case was that Guidant Corporation is directly liable for its own acts. This was the theory set forth in the original Complaint and in the First Amended Complaint (the one actually filed with the Court), and it was the theory employed by Hexamedics to withstand Guidant Corporation's motion for summary judgment. At this late stage in the litigation, Hexamedics cannot introduce an additional theory so as to hold Guidant Corporation vicariously liable for the acts of Guidant Europe and Guidant France. Consequently, Hexamedics cannot introduce evidence at trial that would be relevant only if such a theory were a part of this case. Accordingly, the Court concludes that evidence of conduct and statements of Guidant Europe and Guidant France is inadmissible for the purpose of establishing the liability of Guidant Corporation itself.

This conclusion does not dispose of Guidant Corporation's entire motion. Not all of the conduct and statements challenged by Guidant Corporation are necessarily attributable to Guidant Europe or Guidant France. Some of the officers and directors of Guidant Europe and

Guidant France also held positions with Guidant Corporation. The Court will admit evidence of conduct and statements of persons who held positions with the parent and a subsidiary, provided that Hexamedics lays an adequate foundation by showing that the person engaged in the conduct or made the statement on behalf of Guidant Corporation, rather than the subsidiary. For instance, Guidant Corporation argues that the Court should exclude evidence of statements made by Richard Van Oostrom. The record indicates that Van Oostrom was the President of Guidant Europe and an officer of Guidant Corporation. In its ruling on Defendants' motion for summary judgment, the Court stated that a reasonable juror could conclude that Van Oostrom's statements were made on behalf of Guidant Corporation. *Hexamedics*, 2002 WL 246678, at *5 n.5. The Court therefore denies Guidant Corporation's motion as it relates to evidence of Van Oostrom's statements.

Guidant Corporation also moves for the exclusion of evidence of statements made by Joël Boudeville. Guidant Corporation maintains that Boudeville was an employee of Guidant France, and that he did not hold a position with Guidant Corporation. If this is true, then evidence of Boudeville's statements cannot be admitted for the purpose of establishing the liability of Guidant Corporation. Hexamedics has submitted deposition testimony indicating that Boudeville was the "business director for southeastern France for Guidant," and that Boudeville's statements expressed "Guidant's official position." (Sarda Dep. at 10-12.) The excerpts of the deposition testimony submitted by Hexamedics do not provide any guidance as to whether the generic label "Guidant" refers to Guidant Corporation or Guidant France. Thus, the Court cannot determine at this time whether Boudeville's statements are admissible.

The principles discussed above will guide the Court's evidentiary rulings at trial. To summarize, evidence of conduct and statements of persons who held a position only with

Guidant Europe or Guidant France will not be admitted for the purpose of establishing the liability of Guidant Corporation. Evidence of conduct and statements of persons who a held a position with Guidant Corporation and Guidant Europe or Guidant France will be admitted for the purpose of establishing the liability of Guidant Corporation if Hexamedics lays a foundation showing that the conduct was performed or the statement was made on behalf of Guidant Corporation.

## III. CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1. Defendants' Motion to Exclude Plaintiff's Expert Testimony [Docket No. 135] is GRANTED with respect to the lost-profits model, and DENIED with respect to the lost-value model.

2. Guidant Corporation's Motion for Leave to File Three Additional Pages [Docket No. 164] is GRANTED.

3. Guidant Corporation's Motion to Exclude Evidence of Actions by Non-Party Guidant Subsidiaries [Docket No. 143] is GRANTED in part and DENIED in part.

Dated: April 30, 2003

JOAN N. ERICKSEN
United States District Judge